Charlotte C. Joslyn, Appellee, Thomas Hart Fisher, Assignee, v. George R. Joslyn, Appellant.

Gen. No. 44,452.

Opinion filed May 10, 1949. Rehearing denied June 3, 1949. Released for publication June 3, 1949.

HUBBARD, BAKER & RICE, of Chicago, for appellant; ALVIN G. HUBBARD, of Chicago, of counsel.

CASSIUS M. DOTY, JAY FREDERICK REEVE and PRESTON BOYDEN, all of Chicago, for appellees.

PER CURIAM. Defendant, George R. Joslyn, appeals from a decree entered January 27, 1948, awarding $3,500 in attorney's fees to Thomas Hart Fisher,

former attorney for plaintiff Charlotte C. Joslyn, and directing payment of $1,000 toward expenses claimed to have been incurred by Fisher in this proceeding and three other cases. Fisher filed a cross-appeal from certain parts of the decree.

August 30, 1939, plaintiff filed her complaint for divorce on grounds of desertion. Defendant filed an amended answer and counterclaim denying the desertion charge and asking for a divorce from plaintiff on the ground that she had been guilty of adultery with divers persons. The trial commenced June 14, 1940, before Judge JOHN CHARLES LEWE, then of the superior court, and continued intermittently until October 1, 1940, when a decree was entered. On September 30, 1940, the day preceding the entry of the decree, the court called plaintiff and defendant into his chambers. Plaintiff told Judge LEWE that she would accept whatever defendant proposed to offer. Defendant offered to pay plaintiff $100 a month, and $100 monthly for each of the four minor children. The parties agreed upon custody provisions. Judge LEWE then called counsel into chambers and told them of the agreement. Fisher had already been awarded $1,000 attorney's fees under two prior orders; $1,500 more was proposed for attorney's fees for him. He did not object to the amount, but asserted that if the attorney's fees were included in the decree it might look as if he had settled his client's case in order to obtain fees, and accordingly it was agreed that the question of attorney's fees should be decided by the court as though the issues upon the complaint and counterclaim had been decided in favor of George R. Joslyn. He objected to having a mandatory order to that effect inserted in the decree, stating that he thought it would invalidate the decree. The provision is embodied in the decree and set forth *verbatim* in our former opinion, *Joslyn v. Joslyn*, 315 Ill. App. 160. When the decree was presented October 1, 1940, the court asked if there

were any objections. Fisher replied that there was no provision in the decree that Mrs. Joslyn might visit the children in the summer time, but he made no objection to the alimony allowance. On December 28, 1940, Fisher perfected an appeal from the agreed provision as to alimony. We affirmed the decree (*Joslyn v. Joslyn, supra*). It is apparent from the record, as pointed out in our former opinion, that Judge Lewe was reluctant on account of the children to make an adjudication of adultery against Mrs. Joslyn. He said: "Maybe, I have got to, under the evidence; but I do not want to. Now, do you want me to make a finding of adultery against this woman?" Mr. Hubbard, representing Joslyn, replied: "No; I do not, Judge." The court then asked: "Why shouldn't this case be settled?" Fisher replied: "We want a finding that Mrs. Joslyn has not been guilty of misconduct. I think the decree should find that neither Mrs. nor Mr. Joslyn has been guilty of adultery." Pursuant to this colloquy the consent decree was entered and the charges of adultery were in effect expunged by judicial decree. Fisher later contended on the first appeal that neither he nor his client agreed in open court to the payment of any definite alimony. We pointed out in our former opinion that upon oral argument Fisher was asked why, if he thereafter intended to question the amount of alimony allowed, he did not fairly and frankly apprise Judge Lewe of his real position, to which Fisher replied that he felt that Mrs. Joslyn had won a great victory and that he thought it best to say as little as possible at the time. We said that the only reasonable inference that could be drawn from Fisher's conduct is that he desired, above all things, a decree that would find his client not guilty of adultery, and that he was satisfied, for the time being at least, with the amount of the alimony allowed plaintiff. The decree reserved jurisdiction to determine whether or not any attorney's fees should be paid to plaintiff, and as stated in

our former opinion, ''Fisher was so pleased with the great victory won for Mrs. Joslyn that he was satisfied to have incorporated in the decree a provision that in the determination of the question as to whether any attorney's fees should be paid by defendant to plaintiff the court might consider the matter of fees 'as though the issues upon the counterclaim had been determined in favor of George R. Joslyn.' '' We stated that ''the instant claim [a sought increase from $500 to $1,500] as to alimony must be considered as an afterthought, for if we assume that counsel intended at the time to thereafter question the amount of the alimony then we must conclude that he was not honest in his conduct toward the trial court. Counsel knew, as he stated to this court, that plaintiff had won a great victory, but he also knew that that victory might be endangered if he then made the claim as to alimony that he now makes.'' We concluded by finding that plaintiff and defendant agreed as to the amount of alimony that should be allowed plaintiff ''and that her counsel acquiesced in the agreement.''

On November 8, 1940, thirty-eight days after the entry of the original decree for divorce, Fisher filed a petition for attorney's fees on behalf of Mrs. Joslyn asking that she be allowed $24,190.31 for fees and expenses, against which there would be credited the $1,000 previously paid. On July 1, 1946, some six years later and after a veritable flood of litigation had been carried on in several courts, Fisher rendered a supplemental bill for services to Mrs. Joslyn, who was then residing in Williamstown, Massachusetts. In that statement he itemized his services and expenses as follows: $19,770 for professional services in connection with the divorce proceeding in the superior court rendered prior to October 1, 1940; $24,723.75 for services rendered from October 1, 1940 to July 1, 1946; $2,745 for services rendered in connection with the appeal from the consent decree; and $12,311.25 for pro-

fessional services in connection with the litigation concerning the Lake Bluff property, the sale value of which he, himself, estimated to be "approximately $12,500"; these items aggregated the sum of $59,550. To that statement he added $1,335 for professional services in connection with various miscellaneous matters, "including Dr. William F. Wolsey, income tax matters, action to recover custody of children, settlement of creditors' claims and defense of creditors' suits, etc.," making a grand total of $60,885. The statement showed that there had been paid on account to him, $8,057.14, leaving a balance claimed to be due of $52,827.86. On November 26, 1940, the petition for fees was referred to John J. Kelly, master in chancery of the superior court. The decree of October 1, 1940 made *no reservation whatever* of jurisdiction to allow expenses other than attorney's fees. The order of reference to Master Kelly directed him to "take the evidence and report the same to the court together with his conclusions of law and of fact as to whether or not Charlotte C. Joslyn is entitled to any solicitor's fees, and if any, the amount thereof." Other than the above, the master was not directed to make any finding nor was he authorized to hear evidence of expenses other than solicitor's fees.

After an exhaustive hearing the master presented his amended report, prepared April 22, 1947, as follows: "The Master finds, and the evidence overwhelmingly supports his findings, that this petition should be denied because the said Thomas Hart Fisher by his actions, his false statements, and his conduct, unbecoming a lawyer in the case before me and in other courts, [has] no standing in this Court and his position in this Court leaves no doubt he is guilty of unclean hands." The master cited seven episodes of Fisher's misconduct, and concluded as follows: "The Master states. that the evidence supporting his findings and conclusions are such that it leaves no doubt in his mind

as to the guilt of the said Thomas Hart Fisher and that his conduct is inexcusable and the Master finds that the petition is without equity and should be dismissed and that the costs be taxed against the said Thomas Hart Fisher.''

Preliminary to a discussion of what Fisher's claim involves, some explanation is necessary of the so-called Joslyn trusts, which were brought into this protracted litigation by Fisher in two separate proceedings. On August 14, 1935, Alice N. Joslyn, defendant's mother, created a trust with 25,000 shares of Joslyn Manufacturing and Supply Company, naming Bently S. Handwork, Ralph C. Boozer and Philip W. Lotz as trustees. She gave one-fourth of the income to George R. Joslyn during his life. On his death the portion of George R. Joslyn was to vest in his children equally. On the following day, August 15, 1935, Marcellus L. Joslyn, defendant's father, created a similar trust with 20,000 shares of the same stock, naming the same trustees and giving defendant and defendant's children an interest similar to the other trust. Each year, beginning with 1938, $23,000 to $40,000 has become payable to defendant from the combined income from the two trusts. Since 1938, defendant has had substantially no other income.

June 12, 1938, plaintiff and defendant signed a separation agreement under which substantially all the household furniture was given to Mrs. Joslyn. The home in Lake Bluff was to be her property. Defendant promised to pay the $20,000 mortgage against it. Plaintiff agreed not to sell or encumber the same, except with the written consent of defendant, and to make provision that it pass to the children on her death, and if the children predeceased her, then to defendant. Defendant was to pay plaintiff each month $200 for herself, and $200 for each of the four children until they should reach 25 years of age. These payments, however, were not to exceed 40 per cent of de-

fendant's income. Defendant was to procure an annuity life insurance contract of $200 per month payable to plaintiff for life, to commence upon the death of defendant. The separation agreement recites that the trusts created by defendant's parents are the principal source of his income. During the 15 months following June 12, 1938, defendant made payments to and for Mrs. Joslyn in the amount of $15,394.22, an average of $1,029 per month.

Fisher's claim for fees and expenses ''in connection with'' the divorce case, which was the subject matter of the petition referred to Master Kelly and of this appeal, included his expenses and time in three other cases. His activity in a bankruptcy proceeding, which will hereinafter be referred to, is inseparably involved with his activity in the divorce case. In his statement of account in the cross petition filed by him in the divorce case December 19, 1946, Fisher has included his activities in two other proceedings. The matters in which he claims fees ''in connection with'' the divorce case may be summarized as follows. On September 26, 1938, before the complaint for divorce was filed in the superior court of Cook county, Fisher lodged, on behalf of Mrs. Joslyn in the circuit court of Lake county, a complaint against George R. Joslyn for separate maintenance. It alleged the marriage, the birth of the four children, and defendant's desertion of plaintiff on February 1, 1938; it further charged that she had been induced to sign the separation agreement of June 12, 1938, by fraud; that defendant had by fraud induced her to execute deeds of plaintiff's real estate in La Grange, Illinois and in Allegan county, Michigan. The complaint sought separate maintenance, cancellation of the separation agreement, and cancellation of the two deeds. It should be pointed out that the charge of fraud with regard to the real estate was re-alleged and kept pending after Mrs. Joslyn twice testified, in Fisher's presence, that she never

claimed or had any interest in the property. The complaint for divorce, as heretofore stated, was filed August 30, 1939. It alleged that defendant had deserted plaintiff February 1, 1938 and had continued in such desertion. No other ground was alleged, and the complaint was never amended. In this connection it should be noted that if the allegations were accepted at face value, the separate maintenance suit, filed September 26, 1938 in Lake county, had stopped the running of the statutory desertion period at seven months and twenty-six days under the established rule in this State. *Floberg v. Floberg,* 358 Ill. 626.

Also included in his claim for expenses and services ''in connection with'' the divorce case was a suit filed for Mrs. Joslyn, September 14, 1939, against George R. Joslyn, Marcellus L. Joslyn, Joslyn Manufacturing and Supply Company, and the individual trustees of the two Joslyn family trusts, wherein he charged George R. Joslyn and his father with making fraudulent conveyances and concealing the Joslyn assets, and wherein he asked that the income from those trusts be sequestered for Mrs. Joslyn. Fisher never directed that service be made on anyone other than George R. Joslyn, and no one else was served. It will be noted that Fisher sought by this suit to sequester for Mrs. Joslyn and the children the trust funds he later attempted to sequester in the bankruptcy case for a depositor of the defunct Bank of Commerce.

In his claim for expenses and services ''in connection with'' the divorce case Fisher included a suit filed for Mrs. Joslyn in the municipal court of Chicago. It appears that August 28–30, 1939, the parties agreed that George R. Joslyn should have the custody of the children for the following two weeks. He furnished bond for $50,000 conditioned upon the return of the children, and received the children a day late. While visiting with defendant the children were under the supervision of Caroline Pekar, an employee of Char-

lotte C. Joslyn. On September 14, Caroline Pekar talked with Mrs. Joslyn on the telephone, asking whether it would be all right if the children were returned the following day. Mrs. Joslyn indicated that she expected her to "follow the agreement." The children were in fact returned on the 15th. On September 15, Fisher instituted suit in the municipal court of Chicago against defendant and defendant's brother upon the bond of $50,000.

As a further indication of his propensity for litigation, Fisher on September 15, 1939, filed a petition for an injunction in the suit then pending in the superior court of Cook county alleging that a dividend was about to be paid George R. Joslyn by the trustees of the Joslyn family trust; that unless the court would by injunction restrain the trustees from paying the dividend due September 15, 1939, in the sum of $8,437.50 to George R. Joslyn, the plaintiff would be without any adequate means of support and maintenance for herself and the four children; and on the day the application was made on Fisher's motion, the court entered an order restraining the trustees from paying to George R. Joslyn any of the income from the aforesaid family trusts. In this connection it should be noted that later, on June 5, 1944, in the bankruptcy proceeding then pending in the United States District Court, Fisher obtained a similar injunction against these trustees, purportedly on behalf of a depositor of the defunct Bank of Commerce.

Fisher's activity as Mrs. Joslyn's counsel from 1938 to 1946 in the various matters heretofore mentioned, may be explained in part by the following incidents. On August 12, 1940, while the divorce proceeding was in the process of hearing before Judge LEWE, Fisher obtained from his then client Mrs. Joslyn the following assignment in writing: "Know All Men that I, Charlotte C. Joslyn, wife of George R. Joslyn, now residing at 5724 Dorchester Avenue, Chicago, Illinois,

do hereby irrevocably constitute and appoint Thomas Hart Fisher, Room 2125, 135 South LaSalle Street, Chicago, Illinois, my sole and exclusive true and lawful attorney coupled with an interest, for me and in my name to demand, receive, sue for, and collect all claims, debts, moneys and demands whatsoever now due or which may hereafter become due to me from George R. Joslyn on account of any alimony payments, pendente lite or final, together with any payments to me for solicitor's fees and suit moneys pursuant to any order or orders heretofore or hereafter entered in that certain proceeding pending in the Superior Court of Cook county, Illinois, known as 'Charlotte C. Joslyn, Plaintiff, vs. George R. Joslyn, Defendant, in Equity No. 39S 9981,' including but without limitation on the foregoing all payments for Seven Hundred Fifty Dollars ($750.00) per month due me for the months of August, September, and October, 1940; and to make, execute and deliver receipts, releases and other discharges for the same, under seal or otherwise, in my name. Upon the nonpayment of any such debt, money or demand whatsoever, I do hereby authorize and direct my said attorney to begin, conduct and prosecute any action, suit or other proceeding whatsoever for recovering and compelling the payment thereof. And I do further authorize and direct my said attorney, in such manner as he shall see fit, to adjust, arbitrate and settle any such claim, debt, money or demand whatsoever or any other action, suit or proceedings in respect thereto. I do hereby assign, transfer, set over, deliver and convey all right, title, claim or interest which I may now have or hereafter have or claim in or to any moneys now due and payable or hereafter due and payable to me pursuant to any order for alimony, suit money and solicitors' fees pursuant to any order heretofore and hereafter entered in said proceeding now pending in the Superior Court of Cook County as aforesaid. I do hereby authorize and

direct my said attorney to appoint in his place and stead as his substitute any attorney or attorneys for me with the full powers herein granted and with full power or revocation; and I do hereby authorize and direct my said attorneys generally to do and perform all acts and things which they may deem expedient or necessary in the premises as fully as I might do if personally present and acting; and I do hereby ratify, approve and confirm whatsoever my said attorneys shall lawfully do or cause to be done by virtue hereof. In Witness Whereof, I have hereunto set my hand and seal in the City of Chicago, County of Cook, and State of Illinois, this 12th day of August, A. D. 1940. Charlotte C. Joslyn (Seal)'' Judge LEWE was never apprised of the fact that such an assignment had been executed.

Thereafter, on April 8, 1941, while the first appeal was pending in this court, Fisher obtained a further assignment as follows: ''Know All Men that I, Charlotte C. Joslyn (formerly married to George R. Joslyn), now residing at 5724 Dorchester Avenue, Chicago, Illinois, do hereby assign, transfer, set over, deliver and convey unto Thomas Hart Fisher, Room 2125, 135 South LaSalle Street, Chicago, all right, title, claim or interest which I may now or hereafter have or claim in and to any moneys now due and payable or hereafter due and payable to me for suit moneys, solicitors' fees and alimony over the sum of $100 per month pursuant to any order heretofore or hereafter entered in that certain proceeding pending in the Superior Court of Cook County, Illinois, known as Charlotte C. Joslyn, Plaintiff, versus George R. Joslyn, Defendant, in Equity No. 39S 9981, provided, however, that the foregoing assignment shall not be deemed to require the undersigned or George R. Joslyn, Defendant as aforesaid, to pay to the assignee hereunder any moneys payable to the undersigned for the support, education or maintenance of the four

minor children of the undersigned. And I, the undersigned, do hereby irrevocably constitute and appoint Thomas Hart Fisher my true and lawful attorney in fact for me and in my name to demand, receive, sue for, and collect all claims, debts, moneys and demands whatsoever now due or which may hereafter become due to me and which are hereby described in the foregoing assignment, and to make, execute and deliver receipts, releases and other discharges for the same, under seal or otherwise, in my name; the power herein given by said attorney shall be deemed to be coupled with the interest herein given. Upon the non-payment of any such debt, money or demand whatsoever, I do hereby authorize and direct my said attorney to begin, conduct and prosecute any action, suit or other proceeding whatsoever for recovering and compelling the payment thereof. And I do further authorize and direct my said attorney, in such manner as he shall see fit, to adjust, arbitrate and settle any such claim, debt, money or demand whatsoever and any action, suit or proceedings in respect thereto. I do hereby authorize and empower my said attorney to appoint in his place and stead as his substitute any attorney or attorneys for me with the full powers herein granted and with full power or revocation; and I do hereby authorize and direct my said attorneys generally to do and perform all acts and things which they may deem expedient or necessary in the premises as fully as I might do if personally present and acting; and I do hereby ratify, approve and confirm whatsoever my said attorneys shall lawfully do or cause to be done by virtue hereof. In Witness Whereof, I have hereunto set my hand and seal in the City of Chicago, County of Cook, and State of Illinois, this 8 day of April, 1941. (Seal) Charlotte C. Joslyn.''

Simultaneously Fisher had Mrs. Joslyn execute a so-called ''letter agreement,'' prepared by him, which reads as follows: ''Mr. Thomas H. Fisher—In order

that you may receive compensation and reimbursement for fees and expenses in the foregoing cases I wish you to be paid from whatever moneys I may receive in addition to $500 which I am presently receiving under the divorce decree of October 1, 1940 if the appeal therefrom is successful, and from any interest which I may have in the Lake Bluff property if my counter-claim is successful. Accordingly I am signing contemporaneously herewith two assignments and powers of attorney coupled with an interest, assigning my rights in the Lake Bluff House and under the June 12, 1938 settlement contract in so far as they are assignable, and in any increase which I may be entitled to for alimony and support over $500 per month. These assignments are collateral security for the payment of your past services and expenses already paid and for future attorney's fees and expenses which may hereafter be rendered and incurred by you for my benefit. It is of course definitely understood that when you have received your conpensation and reinbursement for fees and expenses, the assignments which I am giving you will be null and void and that I shall receive all future payments, both for alimony and support and from the Lake Bluff House or otherwise, thereafter. It is understood that your final bill for attorney's fees shall be computed from January 15, 1938 at the rate of $15 per hour for all services rendered by yourself and the other attorneys who have been and will be associated with you. I shall promptly pay you any moneys received by me on account of attorney's fees and suit moneys based upon my amended petition for solicitor's fees which has been referred to Master John J. Kelly, and any future petition for solicitor's fees and suit moneys which may be filed by me or on my behalf. Yours very truly, Charlotte C. Joslyn.''

Fisher asserts that by means of these assignments he became entitled to all sums awarded to Mrs. Joslyn for

alimony, suit money and fees in excess of $100 a month allowed as alimony and $400 support money for the children, but George R. Joslyn's counsel has steadfastly contended that Fisher has obtained, or sought to obtain, as well, the monies paid from time to time for the support of the children. This requires a consideration of the recorded facts. The order of the superior court of September 19, 1939 provides "that George R. Joslyn . . . pay to Charlotte C. Joslyn . . . as temporary alimony and for the support of the four children . . . Seven Hundred Fifty Dollars ($750.00) per month commencing with the month of September, 1939 . . ." Then follows the assignment obtained by Fisher from Mrs. Joslyn on August 12, 1940, which authorized Fisher to collect all claims, debts, moneys and demands whatsoever then due or which might thereafter become due to Mrs. Joslyn from her husband "on account of any alimony payments, pendente lite or final, together with any payments to me [Mrs. Joslyn] for solicitor's fees and suit moneys pursuant to any order or orders heretofore or hereafter entered . . . , including but without limitation on the foregoing all payments for Seven Hundred Fifty Dollars ($750.00) per month due me for months of August, September, and October, 1940." In the letter agreement of April 8, 1941, which was executed after the consent decree was entered, Fisher had Mrs. Joslyn express the wish that he should receive any increase to which Mrs. Joslyn "may be entitled . . . for alimony and support over $500.00 per month." In the face of this record it is difficult to believe that Fisher never claimed any of the alimony and support money to which Mrs. Joslyn was entitled. Again reverting to 1946, we find that on December 19 of that year Fisher filed in the superior court an answer and a crosspetition, in paragraph 2 of which he alleged that he was entitled to fees as shown by his Exhibits A and B, namely, $60,885, less payment on account of $8,057.14.

He then claimed that he was entitled under his assignment, of April 8, 1941, and under his Exhibit B, which was a statement of services, and his Exhibit C, which was the letter assignment, also of April 8, 1941, to assert ''all rights of Charlotte C. Joslyn against George R. Joslyn [as well as the trustees of the Joslyn trusts and the First National Bank of Chicago, the depositary of those funds,] which have been heretofore assigned to respondent and cross-petitioner [Fisher] under Exhibits 'A,' 'B,' and 'C,' '' (being fees claimed in his petition filed November 8, 1940, and in a supplemental petition and complaint filed February 13, 1946.) The supplemental petition and complaint referred to asserts a lien upon the two Joslyn family trusts and upon all the funds accumulated in the First National Bank of Chicago under the injunction in the bankruptcy case (to which we shall later refer in greater detail), and it prays that an order be entered on behalf of Mrs. Joslyn to increase the alimony and support and to direct the trustees of the Joslyn trusts to pay the sums to her. Fisher's cross-petition of December 19, 1946, prays that he be substituted as party-complainant ''in lieu of'' Charlotte C. Joslyn in the petition for attorney's fees and in the supplemental petition and complaint of February 13, 1946. The record is replete with evidence that Fisher constantly insisted that Mrs. Joslyn pay to him her alimony and support money.

For an understanding of the bankruptcy proceedings instituted by Fisher in the United States District Court, it should be stated that on February 27, 1937, George R. Joslyn filed a voluntary petition in bankruptcy. He listed as liabilities: $57,100 on 1142 shares of stock of Chicago Bank of Commerce; $105.60 in taxes; $50 to one Dr. Ralph C. Hammill; and $24,214 on notes held by M. L. Joslyn, his father. He did not schedule his interest in the two Joslyn family trusts. In due course he obtained a discharge. Joslyn's expla-

nation for not scheduling the two family trusts created in August 1935 was that he then did not know of the trusts. It is not necessary for us to decide or comment on the plausibility of that statement. However, Fisher learned about this bankruptcy proceeding in his representation of Mrs. Joslyn, and in his petition for fees he makes claim for the time expended by him investigating this bankruptcy proceeding and the bank-stock liability of George R. Joslyn, on five separate days in 1940. Thereafter, in May 1944, Fisher, in the name of the Benevolent and Protective Order of Elks, a depositor of the defunct Chicago Bank of Commerce, filled a petition to have the bankruptcy reopened. On May 31 of that year he made an affidavit that there were unadministrated assets, consisting of George R. Joslyn's interest in the two Joslyn family trusts; that a dividend of 75 cents was to be paid on the stock held in the trusts on June 15, 1944; and that unless the court entered an injunction, the sum of $8,625 would be paid by the trustees to George R. Joslyn, to the irreparable injury of the bankrupt estate. On June 5, 1944, Judge BARNES, acting on Fisher's affidavit, entered an order restraining the trustees from paying any income to George R. Joslyn. Thereupon the trustees opened an account at the First National Bank and deposited the income payable by the trust agreements to George R. Joslyn.

Having thus intervened on behalf of the Elks in the bankruptcy proceeding, Fisher proceeded to advise Mrs. Joslyn by various letters sent to her while she was out of the city, of the developments in that branch of the litigation. On June 14 he wrote to "Dear Charlotte" in part as follows: "Now that the bankruptcy case is in full swing, there is a bare chance that we will be able to get what we have always been after, i.e., a full and complete settlement. There are some indications M. L. Joslyn would like to 'settle up'; and I am hopeful that we can work a final settlement out which

will end all law suits and uncertainties in the future. It appears that M. L. is much more alarmed about the foreclosure case [of the Lake Bluff home] than I had thought possible. He has not taken his defeat there with quite the antagonism which I had expected. Sincerely, Tom." On November 26, 1946, he wrote Mrs. Joslyn: "Dear Charlotte: . . . By this time you will have the good news that we are drawing toward a climax in the bankruptcy case. . . . This morning's court appearance gave me a good chance to talk to our opponents to see if they would recommend a settlement of all matters in which George is now involved. . . . All of these attorneys [naming the counsel who were present in court representing the various interests] said that they would consult with George and see if a settlement could be worked out. It seems to me that we have every reason to feel optimistic at this time."

On December 27, 1945, George Sturtz, George R. Joslyn's attorney in the bankruptcy case, being unfamiliar with the divorce proceeding, asked that the injunction decree of June 5, 1944 be modified to permit the trustees of the Joslyn trusts to pay George R. Joslyn $13,000. He advised Judge BARNES that Joslyn was in arrears $9,000 in alimony and that he had borrowed $4,000 to send to Mrs. Joslyn. At that time Judge BARNES did not know that Fisher claimed part of Mrs. Joslyn's alimony under the assignments. Throughout two or three sessions in the Federal court, counsel for the trustees sought to elicit from Fisher a forthright statement as to the amount of alimony then in arrears. Fisher repeatedly stated that he could not ascertain the amount and that he would have to communicate with Mrs. Joslyn or her present counsel; that he would have to go to the telephone and find out from Mrs. Joslyn's other counsel "what the amount [of alimony] is," and that if Sturtz said it was $9,000, he (Fisher) would check it. Fisher then asked Sturtz if he would guarantee that the $9,000 would reach Mrs.

Joslyn, and Judge Barnes advised him that counsel should arrange to get the $9,000 to Mrs. Joslyn and reimburse Mr. Joslyn the $4,000 he borrowed. Upon this understanding the court released $13,000 of the alimony and support money then due. Immediately after the court session Fisher wired Mrs. Joslyn that the money was to be released *for him.* He said: "Bankruptcy Court today ordered Joslyn Trustees and George pay $13,000 for past and future alimony thus reimbursing *me* for 1945 alimony in full and guaranteeing your alimony in 1946. This represents a complete court victory to date. Strong evidence George may settle all controversies. Congratulations. Best wishes for 1946." (Italics ours.) On the same day, in a letter to Mrs. Joslyn, Fisher wrote: "Dear Charlotte: . . . Therefore, when you receive the $9,000 check, please endorse it in blank and *forward it to me* by registered mail. . . . Your 1946 income will be paid to you at the rate of $100 per week commencing with the first week in January. Assuming that you receive $100 per week for the fifty-two weeks in 1946, or a total of $5,200, there will then be left over $800 with which to pay your 1946 income taxes. . . . I know you will be glad that the weekly checks will increase from $80 per week to $100 per week beginning with January, 1946. . . . Sincerely yours, Tom." (Apparently Mrs. Joslyn had been receiving from Fisher only $80.00 a week during the year 1945.) Afterwards, Fisher asked Sturtz to deliver the $9,000 to him in cash, and he secured from Mrs. Joslyn a special power to indorse the check. Fisher and Crawford, his associate, stood guard at the First National Bank, where the funds were on deposit, and insisted that the bank should not pay the $13,000 to George R. Joslyn unless the $9,000 were delivered to Fisher. Fisher also served a letter on the bank stating that a cashier's check for $9,000 was to be delivered to him.

On January 4, 1946, Sturtz presented a petition setting up the divorce court order of March 16, 1944, which had directed George R. Joslyn to pay 42 creditors' debts which Mrs. Joslyn had incurred and to set up a reserve for income taxes. He asked Judge BARNES to restrain Fisher from interfering with the payment of the $13,000. Fisher told Judge BARNES that he had authority from Mrs. Joslyn to receive the $9,000 check, but Judge BARNES advised Fisher that he would not pay him the $9,000, whereupon Fisher brazenly stated to the court: "I have never asked it to be paid to me at any time. The statement that I wanted $9,000 is in error—" When Judge BARNES learned that under the order of March 16, 1944, Joslyn was to pay the creditors directly and to reserve sufficient funds for income taxes, he told Fisher that he had indulged in a trick because Fisher knew the terms of the order. At the same time Fisher argued that the court should not release the $13,000. He asserted that there would be no assets to administer. However, the court released the $13,000.

Out of the $9,000 released by the court, George R. Joslyn made the income tax reserve and paid the 42 creditors listed in the order of March 16, 1944. He also sent a check for $5,320 to Mrs. Joslyn. Thereafter, on January 15, 1946, Fisher told Mrs. Joslyn that it was imperative that he receive all of the alimony; that if he did not receive it he would be at a disadvantage in appearing for her in court. His letter is as follows: "Dear Charlotte: . . . Please send me the check for the $5,320 at your earliest convenience so that I can truthfully report to the Federal Bankruptcy Court and the Divorce Court that you are not in debt for money borrowed for alimony. The Divorce Court would undoubtedly stop your $500 monthly payments completely if it found you were in debt for past alimony loans. Also, the Federal Bankruptcy Court wants to make certain that your alimony money

is being properly applied. I want George to start paying his 1946 alimony by another order in the Bankruptcy Court as soon as I can get it entered, and until I get your past alimony straightened out, I naturally cannot do this. Please, therefore, do not delay in straightening our back alimony out. . . . Please do not delay in closing our matter up so that I am not at a disadvantage in protecting your interests in both the Bankruptcy and Divorce Courts here. I may be brought into either or both of these courts on an overnight notice and asked whether you have incurred any debts for back alimony or living expenses, and I want to make certain that I can truthfully say No on both points.''

January 1946, was apparently a dull month in the course of this litigation; nothing was pending in the superior court on behalf of Mrs. Joslyn. Nevertheless, on January 18 of that year Fisher devised a purely fictitious hearing in the Federal court; he told Mrs. Joslyn that he had to appear the following Monday before the bankruptcy court to demand 1946 alimony, and that it was essential he receive all the $5,320 alimony and child support money. He wired her as follows: ''Imperative for your protection we appear without delay on Monday before Federal Bankruptcy Court and demand January 1946 alimony now past due. Essential I receive $5,320 certified check Monday so can represent your position truthfully in court and request immediate relief. . . . Deepest thanks. Tom Fisher.'' Four days later, on January 22, Fisher telegraphed Mrs. Joslyn that he had with difficulty *continued* the hearing upon her alimony (another pure fiction), saying: ''Court hearing on increase your income continued with difficulty to Friday. Please telegraph $5,320 immediately so I can represent your situation truthfully showing present necessity for receiving $1,000 monthly. Fearful all our last five years work protect you will be lost. Further delay this

court hearing fatal. Please advise. Thanks. Tom.''
Apparently the urgency of his telegrams brought the
desired result, for Mrs. Joslyn sent him all the alimony
and child support money. Fisher's acknowledgment
is as follows: ''I particularly asked you to get the pay-
ment of $5,320 in my hands before the opening of court
this morning. Unfortunately I did not hear from you
up to the hour of ten o'clock A.M.; and accordingly I
sent you the following telegram: [Telegram as above.]
This afternoon I have received your letter containing
cashier's check for $5,320, for which my thanks. This
clears the deck and enables me to go forward in the
court hearings to get you the increased alimony of
$1,000 per month. I will report to you as this matter
develops. Sincerely, Tom.'' George R. Joslyn's coun-
sel assert that a large portion of the $5,320 alimony
and child support was ''clear profit'' to Fisher. We
have no way of ascertaining the truth of this assertion,
but in the light of the circumstances we entertain no
serious doubt as to the contention made. Fisher's
letters and telegrams show his advances were limited
to 1945, and although he talked about $100 a week, $80
a week is the amount he actually paid, as shown by his
letters. Apparently Fisher required Mrs. Joslyn to
pay to him a considerable part of the alimony received
from George R. Joslyn. One letter shows receipt in
1945 of $770 of the alimony and child support.

Without referring in detail to the proceedings had
before Judge BARNES, lasting several days, it may
fairly be stated that the attorney for the trustees in his
examination of Fisher, and the court, in questions pro-
pounded to him, found it extremely difficult to elicit
answers to simple questions touching upon the amount
of alimony claimed to be due Mrs. Joslyn, and the
fantastic amounts which Fisher then claimed to be due
her or him under the assignments that he held. He
stated in one instance that under the agreement of
June 12, 1938 and the decree of October 1, 1940 the

amount of alimony due as of April 8, 1941 (the date of the letter assignment to Fisher) was "to the best of my knowledge and belief the sum of $38,500." Under the agreement of June 12, 1938 he claimed $35,000, and for amounts falling due between October 1, 1940 and April 8, 1941, the sum of $3,500. In addition to these figures, he claimed there was an attorney's fee due him from Mrs. Joslyn of $31,927.50; and "under the four agreements of June 12, 1938, October 1, 1940, December 16, 1942, March 16, 1944 and June 19, 1946, the total alimony obligations exclusive of suit moneys but including the children's interest was $189,500. I know that these agreements were all in effect as of the end of 1946; and that if you compute all the obligations thereunder you will reach that figure of $189,500." The court repeatedly charged Fisher with distorting facts, and questioned his motives in seeking to reopen the bankruptcy proceedings by asserting in one instance that "I haven't any doubt that for four or five long years it has been your purpose to blackmail and extort from them [the Joslyn family] money by means of this bankruptcy. I haven't the slightest doubt of it"; and in another instance, "It now seems to me that you have been using the processes of this court in order to blackmail and extort. That is the way it looks to me." Subsequently, when the bankruptcy case was assigned to Judge SHAW, he wrote an opinion in the matter, which was reversed by the circuit court of appeals for reasons not related to the subject matter of this case. Judge SHAW, after an exhaustive hearing, reached the same conclusion. He said: "The next move in this court came eight years after the alleged bankrupt had been discharged, and was obviously engineered by Thomas Hart Fisher as a sort of a legal blackmail, in an effort to extort enormous fees from George R. Joslyn in connection with the old divorce case." It is apparent that when Fisher, before Judge LEWE on October 1, 1940, objected to any provision in

the decree for solicitor's fees in a specific amount, he had in mind compensation far more lucrative than any amount to which he would then have been entitled, and that at that time he hoped to collect much larger sums through means of the first assignment that he then had and the other assignments that he obtained shortly thereafter and while the first appeal was pending in this court. It is difficult to understand the events that followed the entry of the divorce decree on any other theory. It would have been a simple matter for Fisher to have proceeded with the hearing before Master Kelly on the reference made for the sole and only purpose of ascertaining whether he was entitled to fees, and, if so, the amount thereof; instead, Fisher initiated the flood of litigation hereinbefore set forth, including two appeals to the United States Court of Appeals, none of which had any relation whatever to his claim for the allowance of fees for defending Mrs. Joslyn in the divorce proceeding.

We have never before encountered a situation where an attorney took an assignment from his client for alimony in a divorce proceeding. Fisher sought to justify it before the master by stating that after substantial testimony was taken before Judge Lewe, Mrs. Joslyn found herself short of funds because she did not have any property of her own; therefore "it became important to obtain some money." Accordingly he attempted to make a loan at the Personal Loan and Savings Bank which was at first refused, but he states "they indicated that if I would come in with the assignment, that they would discuss the matter with me. But they wanted to be perfectly sure that the security in the form of her monthly payments was assigned to me. That was the motive upon which the assignment was obtained; namely, to assist in the securing of funds for the prosecution of this litigation on behalf of a woman who did not have any other support than that from her husband, which was inadequate to the requirements

of this kind of a case, combined with her living expenses.'' Having then procured the assignment, as he states, the bank still refused the loan. But obviously Fisher did not consider it necessary to cancel the assignment after the loan had been refused. The reasons which he stated for procuring the first assignment certainly had no relation to the second assignment of April 8, 1941. It has been the recognized practice in our courts that in the defense of a divorce proceeding, where serious charges are made against a wife, counsel may and should properly present the matter to the chancellor and ask for suit money and solicitor's fees on account. The amount of the loan which Fisher sought to obtain at the Personal Loan and Savings Bank was $400. Manifestly Judge LEWE would have awarded him that sum if he had made a proper showing. As a matter of fact he was allowed $500 as attorney's fees on account during the progress of the trial, in addition to $500 which he had previously obtained. Fisher's explanation of his motive in procuring these assignments is absurd. His present contention that the assignments were legally valid is beside the point. A legal document may be used in furtherance of an ulterior motive. It is the use to which he put these assignments that constitutes the vice of the transaction. It may reasonably be inferred from the circumstances of the case, as disclosed by the record, that the assignments were intended as a means for the collection of the fantastic sums which he later claimed.

All through his examination in the United States District Court Fisher sought to make it appear that a large amount of alimony was due Charlotte C. Joslyn on April 8, 1941, when the second assignment was executed. Both the attorney for the trustees who examined Fisher, and the court sought to elicit from him an unequivocal answer as to the amount of back alimony that was claimed to be due. Excerpts from the examination show the reluctance with which Fisher

answered the questions of counsel and court: "Q. Was there any alimony due to your client from the bankrupt on the date that you appeared here? A. First appeared in the bankruptcy case, in the spring of 1944? Q. Yes. A. Oh yes. Q. How much? A. I have never figured it. . . . By the Court: Can't you answer that question? By the Witness: I can't give him the figures, sir. I never did figure it. I just don't know. It is very substantial because most of these services were rendered before, and suit money for those comprises the lien. By the Court: He didn't ask you about anything but alimony. By Mr. Johnstone: Q. How much alimony? A. I have never computed it. I don't know. Q. Of the $100 a month that was payable under this decree dated October 1, 1940, how many defaults had been made by the defendant at the time this assignment of yours was given you? A. My recollection is that I would have to check my files to answer a question that is five years old. Q. Was there $100 a month paid? A. Back in 1941, April 8th—I have forgotten, I would have to check it. Q. Was there any default in alimony at the time that you got that assignment from your client? A. There was a default in suit moneys and alimony but the amount of either of them I have never figured to that date; I have never regarded that date as important or germane in any way, and I have never figured it. By the Court: The question was, was there a default in alimony? Can you answer that question? By the Witness: I would say that there was, but as I say I have never computed it." As an excuse for not being able to answer this question Fisher stated that he would have to check his records. He said: "My files in this matter are something like five feet thick." The court then adjourned to enable him to check his records.

At the next session of the hearing, the question was again put to him. "Q. That specific question, how much of this hundred dollars a month, referred to in

this decree, remained unpaid on April 8, 1941? A. Well, it depends on how you treat the payments that went before. I was going to give them to you, to aid you to understand what I believe to be the fact on that date. I don't know that I can answer your question the way you ask it. The obligations on April 8, 1941, if the Court please, were under two instruments. . . . By the Court: Will you answer that question? By the Witness: I don't think that question that way can be answered, at least not by myself; there were two obligations on that date to pay alimony— . . . Q. Now, do you or do you not have present in this court the records which would enable you to answer that question? A. I have never had a record of that type, that I can now recall. If I have I have forgotten it. Q. Do you have present in this court room all the records in your possession containing information as to the account of alimony due from George Joslyn to Charlotte Joslyn on October 1, 1940, and monthly thereafter to April 8, 1941? A. There might be buried in the files of the court over there, and there might be in some of these recorders, something relating to that, but I can't pick it out without at least a great deal of study and effort." Finally the following question was put to him: "I am asking you how much alimony was due, how much was due?" The verbal fencing contined as follows: "A. When? On April 8, 1941? Q. That is right. A. $9,311.24 pursuant to the best calculation I could make under the short time granted me. Q. That is the amount of alimony due under this decree entered October 1, 1940, is that right? A. And under the June 12, 1938 agreement also." His statement to the court and counsel was palpably false, for in his letter of January 15, 1946 to Mrs. Joslyn he enclosed a statement showing all of George R. Joslyn's payments on account of alimony, and referring to this statement he said: "This statement shows that George is fully paid up on his alimony through December 31,

1945''; and he further stated: ''The enclosed statement shows that George computed his back alimony absolutely correctly. I am absolutely certain that the enclosed statement is correct.''

The master's charge that Fisher, by his actions, his false statements and his conduct, unbecoming a lawyer both in the superior court and in other tribunals, rendered himself guilty of unclean hands, is predicated upon seven specific grounds. It would be impossible, without unduly extending this lengthy opinion, to deal with all of these charges separately in any great detail. The first ground is that Fisher falsely and fraudulently induced Judge LEWE to believe he was joining in an agreement for alimony and intended to have his client abide thereby, whereas in fact he remained quiet for a period of over 30 days before making objections, so that the decree would be final; that he viciously and without warrant attacked Judge LEWE and openly accused him of making false statements wilfully; that he attempted to embarrass Judge LEWE by insinuating that Judge LEWE was guilty of collusion; that he aggravated his wilful misconduct in repudiating the agreement made before Judge LEWE by falsely and brazenly stating under oath that he never made the agreement; and that he obtained a consent decree in his client's favor by perpetrating a fraud on the court. We have never entertained the slightest doubt that Fisher procured a decree in his client's favor before Judge LEWE by representing to the court, verbally and by his conduct, that he was concurring in the agreement as to alimony. After waiting until the decree had become final Fisher sought to repudiate it, and he brazenly told Judge LEWE that the court had told Mrs. Joslyn she would receive $700. On November 26, Fisher expressed dissatisfaction with the $500; the court, surprised that Fisher would try to repudiate his agreement, said to Fisher: ''You are trying to tell me now she never agreed to any such amount, is that it?

Mr. Fisher: The Court told her she was going to get $700." Judge LEWE exclaimed: "How can you say that when I told her it would be $500 and that was all she would get, and she said she would take it." Fisher replied: "She never said anything of the kind, and the Court knows that." His position in this respect was aggravated in several subsequent instances. On June 6, 1941, in seeking to delay the hearing upon his charge of fraud in regard to the La Grange and Michigan real estate, Fisher asserted to the master in chancery in the Lake county court that Judge LEWE had denied to Mrs. Joslyn her day in court, and insinuated to the court that Judge LEWE was influenced by sinister reasons. Before Master Kelly, Fisher testified that "No agreement was ever made, of any kind, nature or description by me or by my client in my presence, or in the courtroom, or in chambers, for the payment of any definite alimony or support money or court expense money or counsel fees." The report of proceedings certified to by Judge LEWE shows conclusively that all of these statements by Fisher were false. Still later, upon oral argument on the first appeal, Fisher again repudiated the statements made by his client and his tacit consent to the decree by denying the agreement made by him and Mrs. Joslyn before Judge LEWE. We can conceive of no more reprehensible conduct on the part of an attorney against a judge who manifestly sought to prevent what then appeared inevitable, an adjudication of adultery against Fisher's client.

We have already sufficiently set forth the subject matter of the charge by the master that in December 1945, Fisher "fraudulently concealed from Judge BARNES that he would under his agreement with Mrs. Joslyn get all the money allowed to her," and that by "false and fraudulent representations to Charlotte C. Joslyn" he had "induced her to send him $5,323.00 which Judge BARNES intended to be for Mrs. Charlotte C. Joslyn and her children, and which he would not

have released if he knew Thomas Hart Fisher would get [the money]."

That Fisher planned early in the course of this litigation to force a settlement out of the proceeds of the Joslyn trusts is conclusively demonstrated not only by his letters and telegrams to Mrs. Joslyn after he had reopened the bankruptcy proceedings in the United States District Court, to which we have already alluded, but also by the testimony of Marcellus L. Joslyn, given on deposition in Los Angeles, California, before Master Kelly who went there to take the depositions on February 10, 1941. Mr. Joslyn testified that he first met Fisher in the latter's office on September 26, 1939. He had received a summons to make a deposition in the divorce proceedings then pending. When asked how he happened to go into Fisher's office, he testified that "When I arrived, probably five minutes before the time to take the deposition, Mr. Fisher and others were there and Mr. Fisher said, 'I wish you would come into my office a minute.' " Mr. Joslyn states that he was present with Fisher and one of his associates for about half an hour. After an exchange of pleasantries, Fisher finally said: "Well, Mr. Joslyn, now you have large business interests and a high personal reputation and it wouldn't be very pleasant for you to have this case go to a public appearance. It would damage you personally and would damage your business and I wouldn't like to see it and it can be avoided." Mr. Joslyn testified to the following colloquy between him and Mr. Fisher: " 'Why, of course, I [Mr. Joslyn] would prefer that it shouldn't be. I am more interested in their welfare than in my own. My own welfare doesn't concern me in this case because I don't think it will be affected in any way.' 'Well,' he [Fisher] said, 'it would be a very bad thing and now it ought to be worth a great deal of money to you to avoid this publicity.' 'Why,' I [Mr. Joslyn] said, 'no, it isn't worth anything to me to avoid the publicity for my own sake at all.' 'Well,' he [Fisher] said, 'I know better

than you do about that. It would be very bad for you. Now, . . . a lump sum could be arranged that would avoid everything. The case could be closed up and wiped off the board and there would be no public hearing about it at all; no concern. That would be all and you would be relieved from any suffering.' He [Fisher] went on that way and asked me various other questions and came back repeatedly to 'now, a lump sum could be arranged.' And finally I [Mr. Joslyn] said, 'Mr. Fisher, if you're trying to hold me up personally, I have never submitted to anything of that kind in my life and you can't do it, not for one red cent. I'll not submit to any kind of blackmail. . . . Now, you've gone just as far as I care to go with this proceeding and I suggest that we call it off and return to the action outside which you have held up here for half an hour.' '' Fisher and his associate admit the private conference, but deny that any lump sum was discussed. There can be no doubt from the record presented, however, that an attempt was made by Fisher by methods akin to blackmail to secure from George R. Joslyn's father a very substantial settlement after he had been subpoenaed to Fisher's office for the taking of a deposition in the divorce proceedings. Fisher referred to it in his letter of June 14, 1944, to Mrs. Joslyn as follows: ''There are some indications that M. L. Joslyn would like to 'settle up'; and I am hopeful that we can work a final settlement out which will end all law suits and uncertainties in the future.''

We have already discussed the circumstances indicating that Fisher obtained from Mrs. Joslyn an assignment of all of her alimony above $100, and that some of it, as well as support money, was sequestered by Fisher for his own use. The reasons given by Fisher for taking these assignments are utterly untenable.

The master concluded that the evidence overwhelmingly supported his findings that Fisher's "actions, his false statements, and his conduct, unbecoming a lawyer in the case before me and in other courts, give him no standing in this Court and his position in this Court leaves no doubt he is guilty of unclean hands." This finding is supported by Fisher's conduct in substantially all the tribunals in which he appeared in the Joslyn litigation over a period of eight years. The substance of Fisher's answer to these charges is that his claim and the awards made by the chancellor were for solicitor's fees arising up to, but not after, the entry of the decree of October 1, 1940, and his counsel therefore argue that the extensive litigation thereafter may not be taken into consideration as a bar to the allowance of the fees claimed. It is obvious, however, that the various proceedings subsequent to October 1, 1940, were instituted by Fisher in pursuance of rights acquired by the assignment obtained from Mrs. Joslyn before the divorce decree was entered, and that in the later litigation Fisher was merely seeking to enforce those rights. In effect he waged a campaign to force a settlement from the Joslyn family. He also contends that his conduct does not relate directly to the subject matter of the suit. The plain fact is that Fisher was carrying on a campaign of harassment through court process to force a settlement of all matters, including his petition for attorney's fees. This appears in his letter of June 14, 1944 to Mrs. Joslyn, hereinbefore set forth. Fisher relies on the language of a recent decision, *Mills v. Susanka,* 394 Ill. 439, wherein it was held that the doctrine of unclean hands does not "extend to any misconduct, however gross, which is unconnected with the matter in litigation, and with which the opposite party has no concern." It is Fisher's contention that his conduct, or to put it more accurately, his misconduct, does not relate "directly to the subject

matter of the [divorce] suit.'' The principle enunciated in the *Mills* case is sound, but Fisher apparently overlooks the fact that his conduct following the divorce litigation was directly related to the matter of solicitor's fees ''in connection with'' the divorce case; and certainly it was conduct in which ''the opposite party'' had a very substantial concern.

In answer to the master's first charge that Fisher had repudiated the agreement that he and Mrs. Joslyn made before Judge Lewe and thereafter appealed from the consent decree, Fisher still asserts that he made no such agreement. We have dwelt sufficiently upon that phase of the litigation. The record discloses an utter lack of good faith in his dealings with the chancellor to whom, as he stated on oral argument on the first appeal, he was indebted for ''a great victory,'' and we think his conduct in that matter alone should deprive him of the solicitor's fees he claims, which would admittedly belong to him and not to Mrs. Joslyn. Fisher's answer to charge No. 3 is nothing more than a specious argument as to the language employed in *Joslyn v. Joslyn, supra,* and is predicated on ''a statement [made] argumentatively that if certain things were assumed, it would lead to that conclusion, *but that the Court did not state that the assumption was true.*'' Although we applied the ''light touch'' to Fisher's conduct, a reading of the opinion dispels any misapprehension that may exist in Fisher's mind as to our understanding of his motive in first consenting to the decree and then appealing from it. His contention that our opinion was filed long after the services sued for were rendered, and therefore had no relation to these services, has already been discussed. Fisher was then asserting his own interest under the assignment, and everything that followed was related to the same transaction. With respect to the master's charge No. 4, Fisher still seeks to justify the assignment taken from Mrs. Joslyn pursuant to which much of this litigation was instituted and carried on. That transaction

requires no further discussion. In his charge No. 5 the master found that Fisher had betrayed the interest of Mrs. Joslyn and her children in the United States District Court on Fisher's motion as an attorney for the Benevolent and Protective Order of Elks and enjoined the trustees of the Joslyn trusts from paying income thereunder to Mr. Joslyn and thus "stopped the only source of alimony and support money" from which Mrs. Joslyn and the children could be paid. Fisher had undoubtedly represented to Mrs. Joslyn that the bankruptcy proceedings "would help her and her children." He contends that he had previously withdrawn as attorney for Mrs. Joslyn in relation to that proceeding and that he represented only the Elks as a depositor in the defunct bank; but his letters clearly indicate that he sought to make her believe that he was representing her. Whether or not he had withdrawn as counsel, he used the information that he had acquired in the divorce litigation to enjoin the payment of alimony and support money, with the primary purpose of forcing a settlement that would have inured to his own benefit. The master's charge No. 6 relates to the separate maintenance action filed in the circuit court of Lake county, wherein Fisher sought to recover two pieces of real estate in La Grange, Illinois and Allegan county, Michigan. As already stated, in spite of Mrs. Joslyn's deposition of September 30, 1939, Fisher filed an amended complaint repeating the same charges on November 20, 1940, all of which were later refuted by Mrs. Joslyn's testimony before Master Kelly in December of that year. That charge requires no further comment; nor does the seventh charge, which again relates to the bankruptcy proceedings, in which the master states that "Fisher fraudulently concealed from Judge BARNES that he would under his agreement with Mrs. Joslyn, get all the money allowed to her."

Judge McKINLAY, who entered the decree from which this appeal is taken, found "that the conduct of said Thomas H. Fisher as attorney for Charlotte C.

Joslyn, plaintiff, as shown by the record in this case, should be censured and is such as to warrant a substantial diminution of the fees and expenses he would otherwise be entitled to receive as attorney for plaintiff, Charlotte C. Joslyn, in this case," and "because of the conduct of said Thomas H. Fisher above referred to, there should be deducted from said sum of $6,500 [which the chancellor thought to be reasonable compensation for services rendered by Fisher], the sum of $2,000 . . . ." There is no way of ascertaining what "conduct" the chancellor had in mind in making these findings in the decree; but it is apparent that the court believed he should be censured, and that a substantial diminution of his fees should be made. We think it would not only be a dangerous and far-reaching doctrine but would violate the accepted ethics of the profession to condone his conduct by awarding him any fees.

*It is significant that after pyramiding his fees to the fantastic amounts claimed, Fisher is now willing to accept the comparatively meager sum of $2,034.60.* In his cross-appeal he seeks reversal only of the court's approval of the master's charges.

The master's fees and charges were taxed and allowed by the court in the amount of $6,930.80, of which all, except $2,930.80, was paid by the parties in the course of litigation. The chancellor, upon the basis of the master's certificate and the record before him, taxed one-half of this balance, or $1,465.40, against Fisher. We think the decree is proper in this respect.

During the pendency of this appeal George R. Joslyn's counsel interposed a motion in the nature of a plea for an order finding that a certain provision in paragraph 14 of the decree was not by the judgment of the court but was by consent of the parties, and praying that Fisher be barred from assigning cross-error on said provision of the decree. That motion was reserved to hearing, and in view of our conclusions

as to the merits of the case, we do not consider it necessary to pass upon it.

This case presents flagrant abuses by Fisher of court processes, primarily in his own interest. He has been fully reimbursed for expenses and suit money. In the light of his conduct, he should not be awarded any fees. *The fees he seeks are not to be paid to Mrs. Joslyn. She disclaims them through her present attorney. Fisher is the real party in interest.*

For the reasons indicated, we are of the opinion that the decree of the superior court should be reversed and the cause remanded with directions that a decree be entered in accordance with the master's recommendations, and that $1,465.40 costs be taxed against Fisher and $1,465.40 against Joslyn.

*Decree reversed and cause remanded with directions.*